Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| QUALITY CONSTRUCTION SERVICES II LLC<br><br>Apelado<br><br>v.<br><br>ASOCIACION DE RESIDENTES DEL CONDOMINIO LAS GAVIOTAS Y OTROS<br><br>Apelante | KLAN202400661 | **APELACIÓN** procedente del Tribunal de Primera Instancia Sala Superior de **San Juan**<br><br>Caso Número: SJ2021CV3414 (Salón 603)<br><br>Sobre: **INCUMPLIMIENTO DE CONTRATO Y OTROS** |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, la Juez Grana Martínez y el Juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 21 de noviembre de 2024.

Comparece la parte apelante, Asociación de Residentes del Condominio Las Gaviotas, en adelante Asociación o apelante, mediante el recurso de epígrafe, y nos solicita la revocación de la "*Sentencia*" notificada por el Tribunal de Primera Instancia, Sala Superior de San Juan, en adelante, TPI-SJ, el 26 de abril de 2024. En el referido dictamen, el foro recurrido declaró "Ha lugar" la demanda presentada por la parte apelada, Quality Construction Services II, LLC, en adelante Quality Construction o apelado.

Por los fundamentos que expondremos a continuación, se *confirma la "Sentencia" apelada.*

**I.**

El 3 de junio de 2021, Quality Construction presentó una "*Demanda*" sobre cobro de dinero e incumplimiento contractual en contra de la Asociación de Residentes del Condominio Las Gaviotas

y One Alliance Insurance Corporation.[1] Alegó que, en octubre del año 2017, la Asociación contrató a Prima Quality Solutions LLC, para mitigar daños sufridos a elementos comunes del Condominio Las Gaviotas,[2] tras el paso del Huracán María. Indicó que la Asociación adeudaba la cantidad de $53,166.00, por concepto de servicios prestados. A su vez, sostuvo que adquirió todos los activos y pasivos de Prima Quality Solutions LLC como parte de una dación de pago, incluyendo la deuda mencionada. Adujo, además, que las gestiones realizadas para cobrar la deuda fueron infructuosas. Así pues, le solicitó al Foro Primario que ordenara a la Asociación pagar la cantidad adeudada e interés legal por concepto de cargo por mora, más $13,279.00 por concepto de costas y el pago de honorarios de abogado por temeridad.

El 4 de septiembre de 2021, la Asociación presentó la "*Contestación a Demanda Enmendada*".[3] En lo pertinente, negó la existencia de un contrato archivado en sus expedientes, que haya sido suscrito con Quality Construction. Sin embargo, aceptó que un contratista realizó obras de mitigación de daños tras el Huracán María, pero indicó desconocer la identidad de dicho contratista. En consecuencia, solicitó que se declarara *No Ha Lugar* la demanda instada por el apelado, por desconocer de la deuda y no contar con documentos que acreditaran la alegada relación contractual.

Tras varios incidentes procesales entre las partes, el 13 de julio de 2022, el Foro Primario emitió una "*Sentencia Parcial*" en la que desestimó con perjuicio la demanda contra One Alliance Insurance Company.[4]

---

[1] Apéndice del recurso, pág. 1.
[2] Inicialmente, la parte demandante se refirió al Condominio en cuestión como "Condominio Los Frailes", pero corrigió su error mediante la "*Demanda Enmendada*", presentada el 23 de septiembre de 2021.
[3] Apéndice del recurso, pág. 14.
[4] *Id.*, pág. 30.

Así las cosas, el 4 de marzo de 2024, el TPI-SJ celebró un juicio en su fondo.[5] Por el apelado, declararon Alice Meléndez Merengo y Michelle La Torre Muriel, ambas empleadas de Prima Quality Solutions al momento de los hechos. A su vez, por la apelante, declaró Gerardo Vila Andreu, el actual presidente de la Junta de Directores del Condominio Las Gaviotas.

*Alice Meléndez Merengo* testificó en cuanto a su rol como procuradora de seguros tras el paso del Huracán María.[6] En específico, declaró que el Condominio Las Gaviotas "fue uno de los edificios más afectados por el Huracán María", y que cuando visitó el edificio, vio apartamentos sin ventanas, balcones, ni puertas corredizas.[7] Indicó que el edificio se quedó sin un 38% de sus puertas y ventanas, y que ofreció a los miembros de la Junta de Directores allí presentes el servicio de mitigación de daños que proveía la aseguradora.[8] Además, declaró que *"la Junta dijo que sí, los titulares que estaban presentes, que habían perdido sus hogares, dijeron que sí"*, y que comenzó la coordinación de los horarios y logística de los trabajos a realizarse, con la administración del Condominio.[9] Según la testigo, estos esfuerzos de coordinación se hicieron con "la señora Sylvia".[10] Así las cosas, mencionó que el trabajo fue ejecutado, y Prima Quality Solutions envió una factura desglosando los $53,116.00 en costos por la labor realizada.[11] Añadió que dicha factura jamás fue refutada por la Junta de Directores, y que la presidenta en ese entonces indicó que había que esperar a que el seguro pagara.[12] En cuanto al contrato, Meléndez Merengo reiteró que el mismo no fue por escrito.[13]

---

[5] Apéndice del recurso, pág. 54.
[6] Transcripción del Juicio en su Fondo, pág. 10.
[7] *Id.*, pág. 14.
[8] *Id.*, pág. 20.
[9] *Id.*, pág. 19.
[10] *Id.*, pág. 21.
[11] *Id.*
[12] Transcripción del Juicio en su Fondo, págs. 21-22.
[13] *Id.*, pág. 31.

Por su parte, *Michelle La Torre Muriel* testificó en cuanto a la ejecución del contrato verbal entre la Junta de Directores con Prima Quality Solutions, para efectuar los trabajos de mitigación y remoción de escombros del Condominio Las Gaviotas.[14] Declaró que fue un trabajo extenuante donde los empleados tuvieron que subir y bajar materiales por escaleras, ya que no había electricidad en el condominio.[15] Indicó que la Junta les dio acceso a las facilidades en todo momento, y que se comunicaba con Sylvia, la administradora de aquel entonces, por mensajes de texto.[16] También mencionó que la compañía, a pesar de haber pagado a los empleados, aún no ha recibido ninguna remuneración por los servicios prestados al condominio.[17] A su vez, se admitió en evidencia una cadena de mensajes de texto en la cual la pasada administradora buscó coordinar una fecha para recogido de escombros, mientras que la testigo solicitó la facturación de los servicios.[18] Además, la testigo aseveró haber llevado la factura al condominio presencialmente.[19]

Por la apelante, testificó *Gerardo Vila Andreu*, en calidad de presidente actual de la Junta de Directores.[20] Sin embargo, declaró haber comprado su apartamento en el Condominio Las Gaviotas en junio del año 2021.[21] Es decir, que no era titular en el condominio al momento de los hechos, y desconocía de los acuerdos que se llevaron a cabo cuando surge la controversia ante nos. A pesar de ello, indicó que entendía que, al momento de los hechos, la administradora del complejo se llamaba Sylvia.[22] A su vez, Vilá Andreu admitió que, al revisar el expediente del condominio con relación a la compañía apelada, pudo observar una factura por las

---

[14] Apéndice del recurso, pág. 68.
[15] *Id.*, pág. 71.
[16] *Id.*, págs. 71-72.
[17] *Id.*, págs. 82-83.
[18] *Id.*, pág. 94.
[19] *Id.*, pág. 107.
[20] *Id.*, pág. 115.
[21] *Id.*, pág. 117.
[22] Transcripción del Juicio en su Fondo, pág. 124.

labores efectuadas que totalizaba $53,116.00, y que aún no se había saldado.[23]

Eventualmente, el Foro Primario dictó *"Sentencia"* el 26 de abril de 2024, declarando "Ha Lugar" la demanda.[24] El 13 de mayo de 2024, la apelante presentó una *"Moción de Reconsideración de Sentencia"*, al amparo de la Regla 47 de Procedimiento Civil, 32 LPRA, Ap. V, R. 47.[25] Por su parte, el apelado se opuso el 7 de junio de 2024.[26] Así las cosas, el 12 de junio de 2024 fue notificada una *"Resolución"* del TPI-SJ denegando la moción de reconsideración.[27]

Inconforme con el proceder del Foro Primario, la parte apelante acudió ante esta Curia el 11 de julio de 2024, y en su recurso de *"Apelación"*, le imputa al TPI-SJ los siguientes señalamientos de error:

> **PRIMER ERROR**: Erró el Honorable Tribunal de Primera Instancia al declarar con lugar la demanda condenando a la Asociación de Residentes del Condominio Las Gaviotas (Consejo de Titulares) a pagar la suma de $53,116.00 dólares por unas supuestas obras de mitigación aun cuando dicho Consejo nunca prestó su consentimiento para contratar con la parte Apelada Quality Construction Services II, LLC. (ni su predecesora) y así obligarse al pago de lo reclamado.

> **SEGUNDO ERROR**: Erró el Honorable Tribunal de Primera Instancia al dictar Sentencia condenando a la parte apelante a pagar la suma de $53,116.00 dólares a la parte Apelada Quality Construction Services II, LLC. aplicando la doctrina del enriquecimiento injusto.

---

[23] Apéndice del recurso, pág. 119.
[24] *Id.*, pág. 63.
[25] *Id.*, pág. 72.
[26] *Id.*, pág. 80.
[27] *Id.*, pág. 85.

**II.**

**A. Apelación**

Las Reglas de Procedimiento Civil, supra, se desenvuelven en un orden lógico, natural y armonioso entre sí. Este orden queda demostrado en las distintas etapas de un litigio, entiéndase las alegaciones, mociones, descubrimiento, vista evidenciaria, sentencia, reconsideración, *apelación*, y sus efectos escalonados. Cada etapa se sirve de la anterior y se proyecta, entonces, para la próxima. *Vega v. Alicea*, 145 DPR 236, 238 (1998).

La etapa de la *apelación* se perfecciona con la presentación oportuna de un escrito conforme a las formalidades establecidas en nuestro estado de derecho, que incluye su debida notificación a las partes. El recurso de apelación es aquel que se presenta ante un foro de mayor jerarquía cuando se solicita la revisión de una sentencia, o un dictamen final, emitido por el Foro de Primera Instancia. Regla 52.1 y 52.2 de Procedimiento Civil, 32 LPRA, Ap. VIII, R. 52; *González Pagán v. SLG Moret-Brunet*, 202 DPR 1062, 1070-1071 (2019). Véase R. Hernández Colón, Práctica Jurídica de Puerto Rico: Derecho Procesal Civil, 6ta Ed., San Juan, Ed. Lexis Nexis, 2017, pág. 519.

La *apelación* no es un recurso discrecional como en los casos de *certiorari*. Una vez se cumpla con los requisitos jurisdiccionales y de perfeccionamiento del recurso, el Tribunal de Apelaciones viene obligado a atender el asunto y resolverlo en sus méritos, de forma fundamentada. *Soc. de Gananciales v. García Robles*, 142 DPR 241, 252 (1997). En ese sentido, se reconoce que existe el derecho estatutario para acudir en apelación ante el Tribunal de Apelaciones, cuestionando toda sentencia final emitida por el Tribunal de Primera Instancia. *Silva Barreto v. Tejada Martell*, 199

DPR 311, 317 (2017). Regla 13(A) del Reglamento del Tribunal de Apelaciones 4 LPRA Ap. XXII-B, R. 13(A).

Al revisar una determinación de un foro de menor jerarquía, los tribunales revisores tenemos la tarea principal de auscultar si se aplicó correctamente el derecho a los hechos particulares del caso. Como regla general, los foros apelativos no tenemos facultad para sustituir las determinaciones de hechos del tribunal de instancia con nuestras propias apreciaciones. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770-771 (2013); *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007). De manera que, si la actuación del tribunal no está desprovista de base razonable, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso. *Bathia Gautier v. Gobernador*, 199 DPR 59, 182 (2017); *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).

### B. Apreciación de la Prueba

Es bien sabido que el Foro Primario es el que tiene la oportunidad de ver y observar a los testigos y su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, ademanes, dudas y vacilaciones, e ir formando gradualmente en su conciencia la convicción de si dicen o no la verdad. *Barreto Nieves et al. v. East Coast*, 2024 TSPR 40, 213 DPR ___ (2024); *Graciani Rodríguez v. Garage Isla Verde*, 202 DPR 117, 127 (2019); *Pueblo v. Torres Martínez*, 200 DPR 834, 857-858 (2018); *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 712, 746 (2012); *López v. Dr. Cañizares*, 163 DPR 119, 136 (2004); *Argüello v. Argüello*, 155 DPR 62, 77 (2001). Consecuentemente, los tribunales apelativos no debemos intervenir con la apreciación de la prueba que realizan los tribunales de instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Barreto Nieves et al. v. East Coast*, supra; *Gómez*

*Márquez et al. v. El Oriental,* 203 DPR 783, 793 (2020); *Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013); *Dávila Pueblo v. Viruet Camacho,* 173 DPR 563, 584 (2008); *S.L.G. Rodríguez v. Nationwide,* 156 DPR 614, 623 (2002).

El fundamento principal a esta deferencia es que el juzgador del Foro Primario tuvo la oportunidad de observar toda la prueba presentada, y por ende se encuentra en mejor situación que el Tribunal Apelativo para considerarla. *Argüello v. Argüello,* supra, pág. 78.

Es importante señalar que nuestro Alto Foro ha expresado que cuando se impugnen determinaciones de hechos, basados en la prueba oral, "[e]s imprescindible que se traiga a la consideración del foro revisor la transcripción de la vista celebrada o una exposición narrativa de la prueba". *Graciani Rodríguez v. Garage Isla Verde,* supra, pág. 129. (Énfasis suplido).

Cónsono con este entendido, se ha establecido que:

> "cuando un peticionario señala errores dirigidos a cuestionar la apreciación o suficiencia de la prueba, la naturaleza del derecho apelativo requiere que éste ubique al foro revisor en tiempo y espacio de lo ocurrido en el foro primario utilizando alguno de los mecanismos de recopilación de prueba oral, como lo son: (1) *transcripción de la prueba,* (2) exposición estipulada o (3) exposición narrativa".
> (Énfasis suplido)
> *Pueblo v. Pérez Delgado,* 211 DPR 654, 671 (2023).

Así pues, sentencia nuestro más Alto Foro que "[a]nte la presunción de corrección que revisten las determinaciones del foro primario, quien desee impugnar las mismas deberá colocar al tribunal revisor en posición de atender correctamente sus planteamientos sobre la apreciación y la credibilidad de la prueba oral desfilada". *Pueblo v. Pérez Delgado,* supra, pág. 674.

Finalmente exponemos, que cuando esta Curia entienda que medió pasión, prejuicio o parcialidad en el dictamen que revise, podrá entonces, en cuanto a ello, intervenir, solamente si así puede fundamentarlo. *Gómez Márquez et al. v. El Oriental*, supra, pág. 795. Quien señale que el juzgador actuó de esta manera, debe sustentar sus alegaciones con evidencia suficiente, pues estas no deben convertirse en un instrumento para ejercer presión contra el Tribunal de Primera Instancia. *Gómez Márquez et al. v. El Oriental*, supra, pág. 795, citando a *Dávila Nieves v. Mélendez Marín*, supra, pág. 775.

### C. Derecho Contractual

En nuestra jurisdicción rige el principio de la autonomía contractual y *pacta sunt servanda*. Las partes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, la moral y al orden público. Artículo 1207 del Código Civil de 1930, 31 LPRA ant. sec. 3372.[28] *Betancourt González v. Pastrana Santiago*, 200 DPR 169, 182 (2018); *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 727 (2018). Los contratos tienen fuerza de ley entre las partes contrayentes, ante sus sucesores y ante terceros quienes vienen obligadas a observar sus términos en la forma que dispone la ley. Artículo 1044 del Código Civil de 1930, supra, ant. sec. 2994.

Para que exista un contrato válido deben concurrir los elementos siguientes: *el consentimiento de las partes* sobre el objeto y la causa. Artículo 1210 del Código Civil de 1930, supra, ant. sec. 3375; *Demeter Int'l v. Srio. Hacienda*, supra, pág. 727; *Negrón Vélez v. ACT*, 196 DPR 489, 505 (2016). "Estos requisitos se refieren a que

---

[28] El 28 de noviembre de 2020, entró en vigor el nuevo Código Civil de Puerto Rico, Ley Núm. 55-2020. Sin embargo, los hechos del caso de epígrafe ocurrieron previo a la fecha de vigencia del citado estatuto, por lo que haremos referencia y esbozaremos el derecho a la luz del derogado Código.

el acuerdo sea consensual; que exista como objeto una polémica judicial o extrajudicial entre las partes que dé lugar a la transacción, y su causa que consiste en eliminar la controversia mediante las concesiones recíprocas." *Negrón Vélez v. ACT*, supra, pág. 505.

De otra parte, nuestro Tribunal Supremo ha expresado que en las obligaciones contractuales la ley primaria es la voluntad de las partes, y los tribunales no pueden relevar a una parte de cumplir con lo pactado cuando es legítimo y no contiene vicio alguno. *Oriental Financial v. Nieves*, 172 DPR 462, 471 (2007). *De Jesús González v. A.C.*, 148 DPR 255, 271 (1999).

### i. **Contrato Verbal**

Un contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras a dar alguna cosa o prestar algún servicio. *Demeter Int'l v. Srio. Hacienda*, supra, pág. 726-727.

Es menester señalar que, desde tiempo inmemorial, nuestro ordenamiento jurídico ha otorgado plena eficacia a los contratos verbales. Además, el Artículo 1230 del Código Civil de 1930, 31 LPRA ant. sec. 3451, dispone que los contratos han de ser obligatorios, *"cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez"*.

Así pues, nuestro ordenamiento reconoce como perfectamente vinculante un contrato verbal. *Colón Colón v. Mun. de Arecibo*, 170 DPR 718, 730 (2007). En apoyo a lo anterior, nuestro Tribunal Supremo expresó que:

> "[l]a eficacia de los contratos no depende de sus formas extrínsecas, sino de la concurrencia de las circunstancias necesarias para su validez, siendo obligatorios, cualquiera que sea la forma de su celebración, sin que su constancia por documento público o privado que para algunos exige la

ley, sea requisito esencial para su subsistencia, sino medio coercitivo concedido a los contratantes para compelerse recíprocamente a llenar aquella forma".
*Cintrón v. Fernández*, 22 DPR 483, 488 (1915).

### D. Incumplimiento de Contratos

Los contratos en Puerto Rico se perfeccionan por el mero consentimiento, y, desde ese momento, las partes se obligan al cumplimiento de lo expresamente pactado y a todas las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la Ley. *Betancourt González v. Pastrana Santiago*, supra, pág. 182. Un contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras a dar alguna cosa o prestar algún servicio. *Demeter Int'l v. Srio. Hacienda*, supra, págs. 726-727.

Ahora bien, el derogado Código Civil dispone que cuando una de las partes en un acuerdo incumple con su deber de entregar o hacer, incurre en mora, desde que el acreedor exige, judicial o extrajudicialmente, el cumplimiento de la obligación. Artículo 1053 del Código Civil de 1930, supra, ant. sec. 3017. Importante es señalar que el acreedor no vendrá obligado a reclamarle a su deudor para que exista la mora, cuando exista una fecha cierta para el cumplimiento de la obligación. Id.

Como consecuencia del incumplimiento contractual, nuestro Alto Foro ha reconocido que el perjudicado tiene la facultad, como regla general, de exigir el cumplimiento específico de lo pactado, o la resolución de la obligación. *Ramírez v. Club Cala de Palmas*, 123 DPR 339, 347 (1989). No solo eso, la norma estatutaria y el derecho jurisprudencial ha reconocido que, en estos casos, la parte a la que se le incumple puede también solicitar el resarcimiento de daños. Id.; Artículo 1054 del Código Civil de 1930, supra, ant. sec. 3018. Véase, además, *800 Ponce de León v. AIG*, 205 DPR 163,181 (2020).

**E. Enriquecimiento Injusto**

La doctrina de enriquecimiento injusto solo procederá cuando no exista Ley que provea para otra causa de acción. *E.L.A.* v. *Cole*, 164 DPR 608, 632 (2005). Es decir, la acción por enriquecimiento injustificado procede cuando el Código Civil no ha provisto un remedio para una situación en la que se produce un desplazamiento patrimonial que beneficia a uno, y enriquece a otro, sin explicación razonable o justificada en el ordenamiento vigente. J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Bosh 1ra. ed. 1983, Tomo II, Vol. III, pág. 44. Además, este principio jurídico no puede invocarlo el gestor de mala fe, ni surte efecto en situaciones en que su aplicación violentaría un criterio de política pública. *Plan Bienestar Salud v. Alcalde Cabo Rojo*, 114 DPR 697, 700 (1983).

Por su parte, en *Plan Bienestar Salud v. Alcalde Cabo Rojo*, supra, pág. 703, el Tribunal Supremo señaló los límites de esta doctrina, a saber:

1. La doctrina del enriquecimiento injusto es aplicable, dentro de determinadas situaciones, a los órganos administrativos.

2. La aplicación de la doctrina dependerá de las circunstancias específicas de cada caso. El Código Civil no agota las situaciones a las que la doctrina se extiende.

3. La doctrina del enriquecimiento injusto no es invocable cuando su efecto es vulnerar un principio importante de orden público encarnado en la Constitución o las leyes del país.

4. La doctrina es invocable, entre otras circunstancias, cuando no se han observado ciertas formalidades de ley fácilmente subsanables o susceptibles de haber sido ejecutadas con el asesoramiento debido.

A su vez, para que proceda la aplicación de la mencionada doctrina es necesario que concurran los siguientes requisitos:

(1) existencia de un enriquecimiento; (2) un correlativo empobrecimiento; (3) una conexión entre dicho

empobrecimiento y enriquecimiento; (4) falta de una causa que justifique el enriquecimiento; (5) inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa.

*E.L.A.* v. *Cole Vázquez,* supra, pág. 633.

En cuanto al requisito de "ausencia de una causa que justifique el enriquecimiento", el Tribunal Supremo ha expuesto que el término "causa" se refiere al acto jurídico que explica o justifica la adquisición de un valor. *Ortiz Andújar v. E.L.A.,* 122 DPR 817, 829 (1988). A saber, para que pueda aplicarse la doctrina de enriquecimiento injusto, el alegado enriquecimiento no debe derivar su fuente de un acto jurídico que legitime su adquisición. De este modo, "el enriquecimiento no es injusto siempre que tenga como equivalente una prestación contractual o título oneroso o gratuito, o que haya sido obtenido como cumplimiento de una obligación legal o natural." *Ortiz Andújar v. E.L.A.,* supra, pág. 829, citando a G. Velázquez, *El enriquecimiento injusto en el Derecho Puertorriqueño,* 5 Rev. Der. Leg. Jur. C. Abo. P.R. 176, 181-182 (1933).

### F. Ley de Condominios de 1958

La derogada Ley de Condominios, Ley Núm. 104 de 25 de junio de 1958, 31 LPRA ant. sec. 1291 et seq., fue aprobada con el propósito de viabilizar la propiedad individual sobre un apartamiento que formara parte de un inmueble sometido al régimen de propiedad horizontal. Ley del Condominio, supra, ant. sec. 1291 nota.[29] De este modo, se estatuyó el derecho de cada titular a disfrutar plenamente del mismo, y de las áreas comunes establecidas, siempre que no resultara en menoscabo de las prerrogativas de los demás titulares. Id.

---

[29] El 16 de agosto de 2020, entró en vigor la nueva Ley de Condominios de Puerto Rico, Ley Núm. 129-2020. Sin embargo, los hechos del caso de epígrafe ocurrieron previo a la fecha de vigencia del citado estatuto, por lo que haremos referencia y esbozaremos el derecho a la luz de la derogada Ley de Condominios.

Ahora bien, el Consejo de Titulares constituye la autoridad suprema sobre la administración del inmueble, y debe estar integrado por todos los titulares. Ley del Condominio, *supra*, ant. sec. 1293b. Entre las funciones correspondientes al referido organismo, el Artículo 38(e) establecía que el Consejo de Titulares era responsable de:

Aprobar la ejecución de obras extraordinarias y mejoras y recabar fondos para su realización.

[...]

(1) Obras Extraordinarias: El Presidente y el Tesorero podrán realizar conjuntamente retiros del fondo de reserva para costear este tipo de obra, *previa autorización mayoritaria del Consejo de Titulares debidamente convocado en asamblea extraordinaria para atender este asunto específico.*

[...]

Se entenderá por extraordinaria *toda obra de mantenimiento no prevista en el presupuesto anual,* que requiera el diez por ciento (10%) o más de dicho presupuesto o la imposición de una derrama para su ejecución.

(2) Obras Urgentes: El Presidente y el Tesorero podrán realizar conjuntamente retiros del fondo de reserva para toda obra urgente no prevista en el presupuesto anual, cuya ejecución requiera el diez por ciento (10%) o más de dicho presupuesto o la imposición de una derrama, *previa autorización mayoritaria del Consejo de Titulares debidamente convocado en asamblea extraordinaria para atender este asunto específico.* La asamblea para autorizar el desembolso podrá convocarse dentro del plazo de setenta y dos (72) horas sin necesidad de hacer una segunda convocatoria.

[...]

Se entenderá por urgente *toda obra cuya ejecución no pueda posponerse por razones apremiantes de seguridad* o porque sea necesaria para la restitución de los servicios esenciales, tales como el suministro de agua, de electricidad o la puesta en funcionamiento de los ascensores.

## III.

La apelante recurre ante nos con dos (2) planteamientos de error. *En el primero*, arguye que el TPI-SJ se equivocó al declarar con lugar la demanda, a pesar de que nunca prestó su consentimiento para contratar con el apelado. *En su segundo señalamiento de error*, alega que el TPI-SJ incidió al aplicar la doctrina de enriquecimiento injusto. Por estar relacionados ambos errores entre sí, los discutiremos en conjunto. Adelantamos que, en cuanto al *primer señalamiento de error*, a *la parte apelante le asiste razón*. Sin embargo, no coincidimos con esta en su *segundo señalamiento de error*.

En su demanda, el apelado arguyó haber sido contratado *verbalmente* por la apelante para prestar servicios de mitigación de daños, tras el Huracán María. En cambio, la apelante negó su existencia, por no tener dicho contrato archivado en sus expedientes. Sin embargo, *reconoció que una empresa realizó labores de mitigación en el Condominio Las Gaviotas durante ese tiempo*.

No empece a lo último, el Foro Apelado señaló un juicio en su fondo, para el 4 de marzo de 2024. En el mismo, las empleadas del apelado declararon sobre la perfección y ejecución de *un contrato verbal* entre las partes aquí presentes. Alice Meléndez Merengo relató haber visitado el condominio, ver la destrucción que había causado el Huracán María, y ofrecer los servicios de mitigación de daños a miembros de la Junta de Directores y titulares. En específico, detalló haber coordinado con Sylvia, la administradora de ese entonces, la logística y los trabajos a realizarse en el condominio. A su vez, Michelle La Torre Muriel declaró en cuanto a los servicios prestados, el acceso que le proveyó la administración a su equipo de trabajo, y las comunicaciones que tuvo con Sylvia durante el proceso.

Por su parte, el testigo de la apelante testificó que el nombre de la Administradora, durante el Huracán María, era Sylvia. A pesar de no ser residente del condominio al momento de los hechos, también confirmó que, en los expedientes del condominio, pudo observar una factura por las labores efectuadas, que totalizaba $53,116.00, y que aún no se había saldado.

La apelante nos plantea que el requisito de consentimiento entre los contratantes no se configuró porque no se cumplió con las disposiciones de la Ley de Condominios vigente al momento de los hechos. Es decir, en cuanto al consentimiento de un contrato verbal, sostiene que la Junta de Directores nunca prestó su consentimiento para contratar con Quality Construction. Arguye que toda obra urgente o extraordinaria, como la mitigación de daños tras el paso del Huracán María, requería la convocatoria de una asamblea extraordinaria para atender dicho asunto y la autorización mayoritaria del Consejo de Titulares.

De ordinario, esta Curia consideraría este planteamiento desacertado, ya que nuestro ordenamiento jurídico ha reiterado una y otra vez que los contratos han de ser obligatorios, sin importar la forma en que se hayan celebrado, siempre que concurran los elementos de consentimiento, objeto y causa. Sin embargo, el Artículo 38(e) de la Ley de Condominios, supra, nos obliga a coincidir con la apelante en cuanto a la falta de consentimiento en el caso ante nos.

A pesar de que la apelante se benefició del servicio de Quality Construction, el Artículo mencionado establece que el Consejo de Titulares era el responsable de aprobar la ejecución de obras urgentes o extraordinarias y recabar fondos para su realización. En específico, la ejecución de estas obras requería que el Consejo de Titulares convocara una asamblea extraordinaria para que se

autorizara por mayoría. Sin embargo, dicha asamblea nunca fue convocada, ni se obtuvo la autorización mayoritaria del Consejo de Titulares. Por tanto, no existió consentimiento para que se configurara un contrato verbal entre la apelante y Quality Solutions.

No obstante, al evaluar la prueba desfilada en el TPI, no cabe duda de que el apelado llevó a cabo obras de mitigación de daños en el Condominio Las Gaviotas, asistida por la apelante. Es forzoso concluir que la administradora en ese entonces, llamada Sylvia, estuvo encargada de proveerle acceso al apelado para prestar los servicios ofrecidos. A pesar de no existir un contrato entre las partes, el apelado realizó un servicio que fue bien recibido por la Asociación. Incluso, el propio testigo de la apelante admitió la existencia, en los expedientes del Condominio, de una factura por labores de mitigación que totaliza la cantidad reclamada por Quality Solutions.

Ante este cuadro fáctico, es menester confirmar que, a pesar de que no se cumplió con los requisitos de la Ley de Condominios para la aprobación de dichas obras, estas fueron ejecutadas en beneficio de la apelante. Sin embargo, el apelado aún no ha podido cobrar los $53,116.00 que facturó por sus servicios de mitigación de daños. Así las cosas, por no existir un contrato ni un remedio en ley para atender este asunto, *procede la aplicación de la doctrina de enriquecimiento injusto.* Esto así, debido a que, es un hecho incontrovertible que la apelante se enriqueció de un servicio por el cual no ha pagado, mientras que el apelado ofreció un servicio por el cual no ha sido compensado.

## IV.

Por los fundamentos que anteceden, *confirmamos* el dictamen apelado.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

La Juez Grana Martínez concurre con opinión escrita.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

| | | |
|---|---|---|
| **QUALITY CONSTRUCTION SERVICES II LLC**<br><br>Apelado<br><br>v.<br><br>**ASOCIACION DE RESIDENTES DEL CONDOMINIO LAS GAVIOTAS Y OTROS**<br><br>Apelante | KLAN202400661 | ***APELACIÓN***<br>procedente del Tribunal de Primera Instancia Sala Superior de **San Juan**<br><br>Caso Número:<br>SJ2021CV3414<br>(Salón 603)<br><br>Sobre:<br>**INCUMPLIMIENTO DE CONTRATO Y OTROS** |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, la Juez Grana Martínez y el Juez Pérez Ocasio

## VOTO CONCURRENTE DE LA JUEZA GRANA MARTÍNEZ

La **buena fe** contractual no se manifiesta tan sólo al comienzo del **contrato** o en la fase negocial, sino que está presente mientras dure la relación contractual. Asimismo, las partes deben adoptar un comportamiento leal en toda fase previa a la constitución de tales relaciones y deben también comportarse lealmente en el desenvolvimiento de las relaciones jurídicas ya constituidas entre ellos. *BPPR v. Sunc. Talavera*, 174 DPR 686, 695 (2008); L. Díez-Picazo, *Prólogo*, en F. Wieacker, *El principio general de la buena fe*, (J.L. Carro, trad.), Madrid, Ed. Civitas, 1982, pág. 12.

El 17 de septiembre de 2017, fecha difícil de olvidar, el entonces Gobernador de Puerto Rico, Ricardo Roselló Neváres decretó un estado de emergencia a consecuencia del Huracán María. Véase, OE 2017-047. El Huracán María, Categoría 5, fue el huracán más poderoso que ha impactado a Puerto Rico en los últimos 87 años. Causó daños devastadores a la infraestructura, tan severos que, motivaron toques de queda e interrupción de los servicios básicos por un periodo prolongado de tiempo. El Condominio Las Gaviotas no estuvo exento de tales daños. Por tal razón presentó



contra su compañía aseguradora, One Alliance Insurance Corporation, el caso civil número SJ2019CV09749, el 18 de septiembre de 2019, en el cual reclamó los daños sufridos a consecuencia del Huracán María; Incumplimiento de Contrato, Mala fe, Cumplimiento Específico y Violaciones al Código de Seguros, daños que estimó en $5,228,842.44. En la Demanda consignó que y cito: "[a]nte la inacción de One Alliance tras la reclamación y la falta de pago de los daños evidentes, Las Gaviotas se vio obligada a utilizar sus fondos de reserva para realizar reparaciones de emergencia en el inmueble." Este pleito culminó el 2 de noviembre de 2023 con una sentencia de cierre y archivo por estipulación con perjuicio.



No obstante, el 3 de junio de 2021, la apelada presentó el caso que nos ocupa identificado como el número SJ2021CV03414. La compañía Quality Construction presentó una reclamación contra la Asociación de Residentes del Condominio para, en apretada síntesis, cobrar unas obras de emergencia que hicieron en el Condominio a raíz del paso del Huracán María.

La prueba de la parte demandante contó con el testimonio de la señora Alice Meléndez Marengo quien, en el 2017, era productora de seguros.[1] A la fecha de los hechos trabajaba para Prima Quality Solutions, LLC, empresa dedicada a llevar a cabo reparaciones con contratistas como tal, por lo regular, de reparaciones que fuesen referidas a través de seguros.[2] Eventualmente Quality Construction adquirió todos los haberes de Prima Quality Solutions, LLC. Explicó la señora Meléndez Marengo, en su testimonio que, después del paso del huracán "viendo la necesidad, pues entonces **se consulta con la Junta de Directores que estaba allí,** con los miembros que estuvieran, de testigos también, titulares que estuvieran ahí

---

[1] TPO, pág. 13, línea 20-21.
[2] TPO pág. 13, línea 23 a 24, pág. 14, línea 1 a 4.

presentes, que este servicio de proteger la propiedad, de mitigación de daños, que si lo querían se lo podíamos brindar, y entonces ahí empiezan las coordinaciones y se les deja saber que estos servicios pueden ser reembolsables por la póliza de seguros, porque así es que funciona. Y entonces, empezó la coordinación, **se coordinaron con la Junta de Directores** y con la administración del condominio los horarios en que entonces se iban a empezar a hacer los trabajos."[3] Explicó que los servicios brindados consistían en "proteger vida, propiedad. La labor era bajar todo lo que pudiese ser proyectil por las escaleras, no había elevador, estamos hablando de desperdicios de "sliding doors", desperdicios de verjas, se bajan por las escaleras porque no hay elevadores, y entonces se sube lo que son los paneles para proteger la propiedad, para que no siga entrando el agua, y también proteger la vida, que una persona no se fuera a caer, todo eso se subió de parte de Prima Quality por las escaleras, con cubos, y siempre con coordinación con la administración del edificio y con la Junta de Directores." Incluyendo un 38% de puertas y ventanas que ya no estaban.[4] Afirmó que se acordó con la Junta de Directores que esta emitiría un pago por el servicio.[5] El costo razonable era unos catorce dólares ($14) el pie cuadrado por la labor de clausura de apartamentos para protegerlos.[6] Sobre la inmediatez del asunto sostuvo que, en ese momento al condominio, quien lo representaba, la Junta, tenía la responsabilidad de mitigar y de proteger la vida y la propiedad. Por eso, en ese momento, todo se hizo de manera inmediata. La Junta dijo que si, los titulares que estaban presentes, que habían perdido sus hogares, dijeron que sí.[7] Así sostuvo que, una vez se acordó, empezó la coordinación directo con la administradora, que en ese



---

[3] TPO, pág. 15, línea 11 a 22.
[4] TPO, pág. 19, líneas 21-23.
[5] TPO, pág. 16, líneas 1-15.
[6] TPO, pág. 19, líneas 1-6.
[7] TPO, pág. 20, líneas 6-12.

momento se llamaba la señora Sylvia, quien coordinó con Michelle horarios, todos los trabajos, hasta que se completó.[8] Inclusive añadió que los servicios se extendieron para incluir un informe, una inspección general del edificio y cuantificar daños, incluyendo recomendación de costos de reemplazo, de las reparaciones de todo el edificio que ascendían a 1.2 millones y ahí estaba incluido todo el desglose de los trabajos realizados para mitigar...[9] Detalló que enviaron la factura a la Junta de Directores, quienes nunca refutaron la misma y solo expresaron que esperarían a que el seguro pagara.[10] Señaló que la Junta de Directores era quien le había dado la información de la factura al ajustador público.[11] Afirmó contar con correos electrónicos de la presidenta de la Junta de Directores, en aquel momento, Kim Koch, en los cuales solicitaban la factura y mencionaban que había que esperar que el seguro pagara.[12] Relató que inclusive el bufete de Oneill & Borges, quien representa a Las Gaviotas en el pleito contra la aseguradora, le había llamado solicitándole toda la información de la reclamación, incluyendo, la factura de los trabajos realizados por Prima Quality.[13] La señora Meléndez consistentemente, a través de su testimonio, explicó que el contrato fue verbal y autorizado por la Junta de Directores.[14] Arguyó que conocía quiénes eran la Junta de Directores porque ella les proveía, todos los años, el servicio de ir a la asamblea para la aprobación del seguro y todo el servicio relacionado a las reclamaciones, además de conocerlos, pues muchos de ellos eran sus clientes también en sus pólizas individuales. Por último, y en cuanto a las condiciones del condominio al momento de los hechos,



---

[8] TPO, pág. 21, líneas 2-9.
[9] TPO, pág. 21, líneas 14-21
[10] TPO, pág. 21, líneas 23 a 25; pág. 22, líneas 4 a 6.
[11] TPO, pág. 23, 24-25; pág. 24, línea 1.
[12] TPO, pág. 25, líneas 11 a 16.
[13] TPO, pág. 26, líneas 24-25; pág. 27, líneas 1-6.
[14] TPO, pág. 30, líneas 17-23; pág. 31, líneas 19 a 24.; pág. 32, líneas 5-9; pág. 54, línea 20; pág. 55, líneas 1-6.

explicó: "[e]ra un caos, era un caos. Si estamos hablando de las

últimas semanas de septiembre. Aquí estamos hablando que esto se

hizo en noviembre, aquí estamos hablando que eso se hizo en pleno

caos, donde no había comunicaciones, donde había toque de queda

y nosotros teníamos que organizar toda esa logística y todo se hizo

con la mejor intención, buena fe y nunca hubo un cuestionamiento

negativo. Se beneficiaron de esta protección de la vida y la propiedad

y hasta el sol de hoy se siguen beneficiando. Y nadie directamente a

mí de la Junta de Directores me ha indicado que no reconoce este

servicio."[15] A preguntas del magistrado sobre el momento en que se

acordaron los trabajos, explicó:

> Hay titulares hablando. Ahí están los miembros de la
> Junta que siempre tenían contacto conmigo, que los
> conozco, que nos saludamos, nos damos hasta besos y
> entonces me dicen "Pues qué bueno que llegaste" y me
> explican la situación. Y empiezo a ver la magnitud de
> los daños porque no todos los edificios tienen los
> mismos daños ni la misma urgencia. Cuando veo las
> condiciones de que hay apartamentos totalmente sin
> protección, sin barandas y sin.., y sin los cristales, ahí
> yo le digo a la Junta que es su deber proteger la vida y
> la propiedad, que esto no es esperar por la compañía de
> seguros para que venga a proteger, es deber de ellos
> proteger la vida porque alguien se puede caer por esos
> balcones y si la dejan sin protección los daños siguen
> siendo mayores, así que imaginen mucha gente
> hablando, su grupito y también la Junta. Entonces a la
> Junta, cuando le digo su responsabilidad, los que están
> alrededor escuchan y empiezan a decir "No, pero yo no
> puedo. Yo no puedo ir a comprar paneles. No, pero es
> que yo no tengo una "pickup". Entonces empezó el caos
> y estoy viendo la necesidad, estoy viendo el caos, estoy
> viendo la responsabilidad del asegurado y ahí les digo
> entonces que existe este servicio. "Déjame coordinar,
> déjame confirmar si es posible porque todos estamos en
> emergencia". Nosotros también, los servidores, somos
> humanos y tenemos familia, Michelle también.
> Entonces yo confirmo que en efecto se va a poder lograr
> **y entonces la Junta dice "Dale"** y está todo el
> entendimiento de que es tu responsabilidad proteger y
> de que esto lo cubre el seguro. O sea, que ese dinero es
> seguro, ese dinero va a llegar. Y entonces ahí empiezan
> las coordinaciones directamente de Michelle con la
> administración. Yo soy la que tengo un contacto directo
> con la Junta y Michelle entonces empieza toda la
> logística de los horarios, el toque de queda, por dónde

---

[15] TPO, pág. 52, líneas 6 a 20.

se suben los materiales, qué materiales se suben. No había sierra, no había electricidad.[16]

Detalló también que, en ese momento, fue que se habló del costo en el mercado, de los catorce dólares ($14).[17] Reafirmó que la Junta de Directores fue quien autorizo el trabajo.[18]

El testimonio de la señora Meléndez Marengo fue corroborado por la señora Michelle La Torre Muriel, quien en el 2017 trabajaba para Quality Construction Services y para Prima Quality Solutions.[19] Esta ratificó que los trabajos se efectuaron mediante un contrato verbal de la Junta con Prima Quality Solutions.[20] Señaló que la Junta era quien les daba acceso en todo momento para efectuar los trabajos.[21] Reconoció el Exhibit 1 de la parte demandante como la factura de servicios realizados.[22]



A pesar de que el señor Gerardo José Vilá Andreu fue anunciado como testigo del Condominio, llegado el momento de presentar su prueba, determinaron no hacerlo y ponerlo a la disposición de la parte demandante, quien terminó interrogándole. Vilá Andreu es el presidente actual del Condominio.[23] Este explicó que llegó al Condominio en el 2022 o a finales del año 2021.[24] No estaba en el Condominio para la fecha de los hechos.[25] Aceptó desconocer las acciones que tomó la Junta de Directores que estaba presente en el Condominio Las Gaviotas, allá para el año 2017 a 2018, incluyendo los acuerdos verbales entre ambas partes.[26] En preparación para el juicio tuvo acceso al expediente del Condominio

---

[16] TPO, pág. 56, líneas 6 a 25; pág. 57, líneas 1 a 17.
[17] TPO, pág. 57, líneas 17-25 y pág.58, líneas 1-6.
[18] TPO, pág. 58, líneas 7-9.
[19] TPO, pág. 69, líneas 9-10.
[20] TPO, pág. 69, líneas 21-22.
[21] TPO, pág. 71, línea 22.
[22] TPO, pág. 91, líneas 8-20.
[23] TPO, pág. 122, línea 11.
[24] TPO, pág. 117, línea 23.
[25] TPO, pág. 118, líneas 3-9.
[26] TPO, pág. 118, líneas 10-14; pág. 120, líneas 20-25 y pág. 121, líneas 1-2.

y pudo observar la factura entregada en el 2018 y cuyo cobro se reclama.[27]

La señora Meléndez mediante su testimonio probó que la Junta de Directores y múltiples titulares autorizaron el servicio, según brindado ante el caos y la necesidad de tomar medidas inmediatas. Incluso aparentan haber reclamado al seguro por los servicios que hoy se niegan a pagar. Por otro lado, este testimonio fue corroborado con el de la señora La Torre Muriel, quien fue la persona que dirigió y coordinó los trabajos con la Junta y la administradora del Condominio de nombre Sylvia. Ambas testificaron sobre las circunstancias del momento, el alcance de los trabajos, la aprobación de la Junta de Directores y la coordinación durante varias semanas en circunstancias muy adversas de falta de luz, toque de queda, entre otros. Dichos testimonios no fueron controvertidos, pues el propuesto testigo del Condominio no vivía, a la fecha de los hechos, en el lugar ni le constaba de propio y personal conocimiento la información sobre el suceso.

No estoy ajena a que la derogada Ley de Condominios, Ley 104 de 25 de junio de 1958 requería de una asamblea ante una emergencia. Tan es así que, tomando en consideración los escollos de la Ley de Condominios para convocar a una asamblea de titulares ante una emergencia, como la provocado por el Huracán María, se promovió la Ley Núm. 302 de 29 de diciembre de 2018, para permitir un mecanismo de convocatoria de emergencia por correo electrónico. No obstante, estimo que la falta de formalización en la contratación no incidió en el consentimiento. Y es que, en aras de impartir justicia y apegarnos al Derecho, no podemos abstraernos de los hechos. Es de conocimiento general que, en aquellos días, la



---

[27] TPO, pág. 119, líneas 2-20.

infraestructura eléctrica no fue la única afectada, sino también la de comunicaciones.

Por otro lado, tampoco puedo pasar por alto que la legislación imponía unos deberes al director o la Junta de Directores quien constituía el órgano ejecutivo de la comunidad de titulares. Entre estos, atender todo lo relacionado con el buen gobierno, administración, vigilancia y funcionamiento del régimen y en especial, lo relativo a las cosas y elementos de uso común y los servicios generales, y hacer a estos efectos las oportunas advertencias y apercibimientos a los titulares y, atender a la conservación del inmueble y disponer las reparaciones ordinarias y en cuanto a las extraordinarias, adoptar las medidas necesarias dando inmediata cuenta al Consejo. 31 LPRA sec. 1293b-4.



Y es aquí donde preciso enfatizar que la señora Meléndez Marengo recalcó, una y otra vez, durante su testimonio que, al momento del caos, la Junta dijo que sí, los titulares que estaban presentes, que habían perdido sus hogares, dijeron que sí a la realización de los trabajos.[28] Detallo y cito: "[e]ra un caos, era un caos. Si estamos hablando de las últimas semanas de septiembre. Aquí no estamos hablando que esto se hizo en noviembre, aquí estamos hablando que eso se hizo en pleno caos, donde no había comunicaciones, donde había toque de queda y nosotros teníamos que organizar toda esa logística y todo se hizo con la mejor intención, buena fe y nunca hubo un cuestionamiento negativo. Se beneficiaron de esta protección de la vida y la propiedad y hasta el sol de hoy se siguen beneficiando. Y nadie directamente a mí de la Junta de Directores me ha indicado que no reconoce este servicio."[29] Dicho testimonio no fue impugnado. La Junta de Directores, quien tenía la obligación legal de proteger el inmueble y convocar la

---

[28] TPO, pág. 20, línea 10 a 12.
[29] TPO, pág. 52, líneas 10 a 20.

asamblea extraordinaria para atender este asunto, no presentó un solo, un solo testigo con conocimiento personal de los hechos que impugnara el testimonio de los testigos del demandante.

De hecho, la propia Ley 104 recogía en sus disposiciones un precepto específico sobre medidas urgentes y las obligaciones de los demás titulares sobre las mismas que interpretó como una especie de remedio en equidad. Específicamente me refiero a la disposición que permite que cuando el inmueble o sus elementos comunes requiriesen obras urgentes o necesarias de reparación, seguridad o conservación, cualquier titular podría hacerlas a sus expensas y repetir contra los demás para el pago proporcional de los gastos hechos, mediante las justificaciones pertinentes. 31 LPRA sec. 1291o.



La doctrina de enriquecimiento injusto es un corolario del concepto de equidad, lo cual equivale a decir que es la consecuencia del concepto de justicia. *E.L.A. v. Cole*, 164 DPR 608, 632 (2005); *Silva v. Comisión Industrial*, 91 DPR 891 (1965). Es un principio general del derecho fundado en la equidad que informa todo el ordenamiento jurídico. *S.L.G. Sanchez v. S.L.G. Valentín*, 186 DPR 503, 515 (2012); *Mun. Quebradillas v. Corp. Salud Lares*, 180 DPR 1003, 1019 (2011). *E.L.A. v. Cole*, supra, pág. 632; *Ortiz Andújar v. E.L.A.*, 122 DPR 817 (1988). Puede aplicarse a situaciones muy distintas entre sí, siempre y cuando tengan en común un elemento: el que de no aplicarse se perpetraría la inequidad de que alguien se enriqueciese injustamente en perjuicio de otro". *S.L.G. Sánchez v. S.L.G. Valentín*, supra, págs. 515-516; *Silva v. Comisión Industrial*, supra, págs. 897–898.

¿Cómo permitir que se utilice una disposición de ley citada en abstracción de la totalidad de la legislación, para cuestionar un trabajo hecho en una de las circunstancias más críticas que nos ha tocado vivir como pueblo? ¿Realmente se usó como base para

reclamar al seguro de la propiedad, aunque en este pleito se niegue el pago? ¿Constituye fraude o mala fe reclamar algo cuyo pago se niega? Es en situaciones como esta en las cuales como jueces tenemos que echar mano de la doctrina de enriquecimiento injusto para lograr un remedio justo. Y es que las relaciones humanas suscitan algunas situaciones que no encajan prístinamente en determinado precepto jurídico que ofrezca una solución categórica. Los tribunales deben evitar los extremos y hacer acopio del sentido de justicia y equidad atemperado a los diversos principios jurídicos establecidos que conforman el Sistema Judicial puertorriqueño. *Díaz v. Alcalá,* 140 DPR 959, 989 (1996.)

Así recurrimos a la equidad cuando "la ley no ha previsto una situación en la que se produce un desplazamiento patrimonial que no encuentra una explicación razonable en el ordenamiento vigente". *S.L.G. Sánchez v. S.L.G. Valentín,* supra, págs. 515-516; *Mun. Quebradillas v. Corp. Salud Lares,* supra, pág. 1019; *E.L.A. v. Cole,* supra, pág. 632; *Ortiz Andújar v. E.L.A.,* supra.

Para que proceda la aplicación de dicha doctrina es necesario que concurran ciertos requisitos básicos, a saber: (i) existencia de un enriquecimiento; (ii) un correlativo empobrecimiento; (iii) una conexión entre dicho empobrecimiento y enriquecimiento; (iv) falta de una causa que justifique el enriquecimiento, y (v) inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa. *S.L.G. Sánchez v. S.L.G. Valentín,* supra, pág. 516; *Ortiz Andújar v. E.L.A.,* supra; *Morales v. Municipio de Toa Baja,* 119 DPR 682 (1987). La aplicación de la doctrina dependerá de las circunstancias específicas de cada caso. *E.L.A. v. Cole,* supra, págs. 633-634; *Plan Bienestar Salud v. Alcalde Cabo Rojo,* 114 DPR 697, 703 (1983).

En definitiva, escribo esta expresión concurrente, pues contrario a las expresiones de mis compañeros, entiendo que no

hubo ausencia de consentimiento entre las partes. Si bien, la ley dispone de la formalizacion del acuerdo, no me merece credibilidad alguna la posicion del Condominio, quien no presentó un solo testigo que impugnara el consentimiento verbal alegado reiteradamente por la señora Meléndez y ratificado por la señora La Torre Muriel. La ausencia de un proceso cuya ejecución recae únicamente en una de las partes, la Junta de Directores del Condominio, no es suficiente para viciar el consetimiento. Para mí, no es así. Estamos ante una situación en la que se demostró que el Condominio se enriqueció mediante obras y materiales, en las peores circunstancias; que el demandante se empobreció, pues tuvo que asumir el costo de materiales y labor; el enriquecimiento del Condominio es correlativo y consecuencia directa del empobrecimiento del demandante. Además, no existe justificación sobre el hecho de que el Condominio se haya negado a ratificar el acuerdo, de hecho, cuando según las alegaciones de la señora Meléndez, reconocieron la necesidad de los servicios ante la aseguradora y se los reclamaron en el pleito alterno, como un gasto. Es decir, pretenden lucrarse dos veces, una vez, no pagando y, otra, recibiendo el pago de lo que no pagaron.

"Rehusamos las normas e interpretaciones que conduzcan a un resultado contrario a la buena fe. Comentarios a las Reformas del Código Civil. Reafirmamos que '[e]l contenido de eticidad de cada acto deberá examinarse a la luz de sus circunstancias particulares, pero el comportamiento conforme a la buena fe es precepto general que abarca toda actividad jurídica'". *Berríos v. UPR*, 116 DPR 88, 99 (1986); *Velilla v. Pueblo Supermarkets, Inc.*, 111 DPR 585, 588 (1981).

No puedo avalar que no existe consentimiento, porque no se cumplió con la formalidad de una asamblea. Los condómines conocían de la obra y la autorizaron, porque permitieron la entrada de la apelada al edificio y a sus apartamentos para realizar las obras.

Por los fundamentos antes expuestos, estoy de acuerdo con confirmar el dictamen recurrido.

En San Juan, Puerto Rico, a 21 de noviembre de 2024.

Grace M. Grana Martínez
Jueza del Tribunal de Apelaciones